COUNSEL FOR APPELLANTS: FRED ZUCKERMAN, AS REPRESENTATIVE OF THE GENERAL DRIVERS, WAREHOUSEMEN AND HELPERS LOCAL UNION NO. 89 AND WILLIAM LONDRIGAN, AS REPRESENTATIVE OF THE KENTUCKY STATE AFL-CIO, ITS AFFILIATED UNIONS AND MEMBERS, William E. Johnson, Johnson Bearse, LLP, Irwin H. Cutler, Jr., Benjamin S. Basil, Matthew P. Lynch, Priddy Cutler Naake & Meade PLLC, Robert Matthew Colone, Teamsters Local 89, David O'Brien Suetholz, Devon Nora Ros Oser, Branstetter Stranch & Jennings PLLC.
COUNSEL FOR APPELLEE: MATTHEW G. BEVIN, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE COMMONWEALTH OF KENTUCKY, Mark Stephen Pitt, Stephen Chad Meredith, Matthew Kuhn, Office of the Governor.
COUNSEL FOR APPELLEE: DERRICK K. RAMSEY, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE KENTUCKY LABOR CABINET, Michael Gary Swansburg, Jr.
COUNSEL FOR APPELLEES BARRY BRIGHT, JACOB PURVIS, AND WILLIAM PURVIS, William L. Messenger, National Right to Work Foundation, Richard Lynn Masters, Masters, Mullins, & Arrington.
COUNSEL FOR AMICUS CURIAE: KENTUCKY CENTER FOR ECONOMIC POLICY, Pamela Joy Pendorf Thomas.
COUNSEL FOR AMICI CURIAE: INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA; UNITED MINE WORKERS OF AMERICA; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION; AND KENTUCKY PIPE TRADES ASSOCIATION: Kevin Crosby Burke, Jamie Kristin Neal, Burke Neal PLLC, Tony Oppegard
OPINION OF THE COURT BY JUSTICE VANMETER
Under Section 14(b) of the Taft-Hartley Act, 29 U.S.C.[1] § 164(b), Congress authorized states to enact right-to-work laws, i.e. , laws that prohibit union shop agreements and agency shop agreements. In 2017, Kentucky's legislature passed, and the Governor signed, 2017 HB[2] 1, commonly referred to as the Kentucky Right to Work Act, 2017 Ky. Acts ch. 1, § 15 (the "Act").
*586 Significantly, this Act amended KRS[3] 336.130(3) to provide that no employee is required to become, or remain, a member of a labor organization, or to pay dues, fees, or assessments to a labor organization. The Act's stated goal was "to attract new business and investment into the Commonwealth as soon as possible." 2017 Ky. Acts ch. 1, § 14. The issue we must decide in this case is whether the Franklin Circuit Court erred in dismissing constitutional challenges to the validity of the Act, specifically that it violated the Kentucky Constitution's provisions requiring equal protection of the laws, prohibiting special legislation, prohibiting takings without compensation, and that it was improperly designated as emergency legislation. We hold that the trial court did not err and therefore affirm the Franklin Circuit Court's Order dismissing the challenges to the Act.
I. Factual Background.
Bills virtually identical to 2017 HB 1 were introduced in almost every session of the legislature beginning in 2000[4] but never passed. Governor Bevin, as a candidate in 2015, actively campaigned on a platform of "right to work." Matt Bevin for Governor, https://www.mattbevin.com/issues (last visited Aug. 30, 2018). Following his election, he encouraged the electorate in 2016 to support legislative candidates who similarly favored "right to work." When the membership and leadership of the House changed with the 2016 election, the new majority's top priorities were the passage of a number of bills, including 2017 HB 1.
The House Economic Development and Workforce Investment Committee convened a hearing on HB 1 on January 4, 2017. At the hearing, proponents of the Bill testified in support of the Bill.[5] Their testimony included statistics that right-to-work states experience superior economic development and superior employment growth in both union and non-union jobs, specifically referring to Michigan, Indiana, and Tennessee. They cited Kentucky's disadvantage in attracting certain new employers to locate in the state due to the Commonwealth's status as a non-right-to-work state. In addition, Speaker Jeff Hoover referred to a study by Dr. Jeffrey Eisenach that concluded right-to-work greatly benefited job creation, specifically "[p]rivate sector employment grew by 17.4 percent in right-to-work states between 2001 and 2013."[6] Mr. David Adkisson referred *587 to an LSU[7] study which reported that one-third of businesses looking to expand or relocate indicated that right-to-work was important. Mr. Kevin Grove spoke to his experience in attracting industrial development to the Louisville metropolitan area, and the advantage accruing to across-the-river Indiana due to that state's enactment of right-to-work legislation in 2012. The witnesses opposing the Bill, Ms. Anna Baumann and Mr. Bill Londrigan, provided testimony to refute the statistics and claims of the proponents. Much of this testimony is contained in Appellants' brief in this Court and accompanying attachments. 2017 HB 1 was quickly passed, largely on a partisan basis, and signed into law on an emergency basis.[8]
In May 2017, Fred Zuckerman, et al. ,[9] filed an action in Franklin Circuit Court against the Commonwealth[10] challenging the Act on several Kentucky constitutional grounds. Thereafter, Barry Bright, Jacob Purvis and William Purvis filed a motion, which the trial court granted, to intervene as defendants on the side of the Commonwealth.
In June 2017, the Commonwealth filed a motion to dismiss. The Unions subsequently filed a motion for partial summary judgment. After a September 2017 hearing, the trial court issued its Order denying the Unions' motion and granting the Commonwealth's motion. The Unions appealed. Because this case involves significant and important constitutional issues of great and immediate public importance, we granted transfer of the case from the Court of Appeals. CR[11] 74.02.
II. Standard of Review.
This case involves a facial challenge to the constitutionality of the Act under the Kentucky Constitution. We recognize, of course, that all laws "contrary to this Constitution, shall be void." KY. CONST. § 26. "Our functions are to determine the constitutional validity and to declare the meaning of what the legislative department has done. We have no other concern." Johnson v. Commonwealth ex rel. Meredith , 291 Ky. 829, 833, 165 S.W.2d 820, 823 (1942). Furthermore, "an [a]ct should be held valid unless it clearly offends the limitations and prohibitions of the constitution.... [A]lways the burden is upon one who questions the validity of an Act to sustain his contentions." Id. at 833-34, 165 S.W.2d at 823. "In considering an attack on the constitutionality of legislation, this Court has continually resolved any doubt in favor of constitutionality rather *588 than unconstitutionality." Hallahan v. Mittlebeeler , 373 S.W.2d 726, 727 (Ky. 1963) (citing Reynolds Metal Co. v. Martin , 269 Ky. 378, 381-82, 107 S.W.2d 251, 253 (1937) ). We have also held that "the propriety, wisdom and expediency of statutory enactments are exclusively legislative matters." Hallahan , 373 S.W.2d at 727 (citing Craig v. O'Rear , 199 Ky. 553, 557, 251 S.W. 828, 830 (1923) ). Further,
courts are not at liberty to declare a statute invalid because, in their judgment, it may be unnecessary, or opposed to the best interests of the state.... [A]n act will not be declared void on the ground that it is opposed to the spirit supposed to pervade the Constitution, or is against the nature and spirit of the government, or is contrary to the general principles of liberty, or the genius of a free people.
Craig , 199 Ky. at 557-58, 251 S.W. at 830 (citations omitted).
Since the issues involve questions of law, our review is de novo , and we do not defer to conclusions of the trial court. Adams v. Sietsema , 533 S.W.3d 172, 177 (Ky. 2017).
III. Labor-Management Background.
A detailed history of Labor-Management relations would unduly prolong this opinion, but an overview is helpful to the analysis of the issues before us, particularly because 1) the Unions base their challenges under the Kentucky Constitution, in part, on "the letter and the spirit of the document,"[12] and 2) right-to-work laws are explicitly authorized under federal law. 29 U.S.C. § 164(b).
A. Kentucky Labor Law History to 1890.
Trade or labor unions in Kentucky were initially formed in the more urbanized areas of Louisville, Northern Kentucky, i.e. , Covington and Newport, and in the coal fields of Eastern Kentucky. See generally John Hennan, Toil, Trouble, Transformation: Workers and Unions in Modem Kentucky , 113 R EG . OF THE K Y . H IST . S OC'Y 233, 236-37 (2015) (attributing this formation to the post-Civil War period, although some scholars believe union activity existed in antebellum Kentucky). The first reported Kentucky case we have found involving a trade organization was Sayre v. Louisville Union Benevolent Ass'n , 62 Ky. (1 Duv.) 143, 145-46 (1863), in which the court generally recognized the right of workingmen to combine for their own protection and to obtain such wages as they choose to demand, but also noted combinations that *589 prejudice the public by unduly elevating or depressing wages, tolls, or prices of any merchantable commodity are indictable as conspiracies. Four years later, the court decided Lee v. Louisville Pilot Benevolent & Relief Ass'n , 65 Ky. (2 Bush) 254 (1867). In Lee , the court affirmed the right of the organization to charge and collect dues, since "[t]he presumed object of the tariff was uniformity of charges, harmony, efficiency, and fidelity, and not unjust monopoly, or the extortion of exorbitant fees." Id. at 255.
Surprisingly, in the period pre-dating the 1890-91 Kentucky Constitutional Convention, that is it. In that era, and although courts recognized workingmen's right to organize, they also recognized employers' rights to conduct business as they saw fit and, absent a contract, to hire and fire employees generally at will. Furthermore, statutory laws regulating labor contracts, maximum hours, minimum pay, and the like, were generally held unconstitutional as an infringement of the employer's and individual employee's right of contract. See generally F. J. Stimson, HANDBOOK TO THE LABOR LAW OF THE UNITED STATES (New York: Charles Scribner's Sons, 1896), 1-19. Perhaps the most famous, or infamous, case of this era is Lochner v. New York , 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), abrogated by West Coast Hotel Co. v. Parrish , 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937), which held that New York's law prohibiting bakery employees from working more than sixty hours in a week was unconstitutional.
Two cases which post-date the 1890 Constitutional Convention, but which indicate the state of Kentucky labor law in this era are Hetterman v. Powers , 102 Ky. 133, 143, 43 S.W. 180, 182 (1897) (holding that a Union was entitled to equitable protection in the use of label or mark designating product of labor of the members), and Underhill v. Murphy , 117 Ky. 640, 643-45, 78 S.W. 482, 482-83 (1904) (upholding use of strike injunction to protect owner's business and to prevent violence toward and intimidation of his employees).
B. 1890 Constitutional Convention .
Following the Civil War, special legislation was used as a means to encourage Kentucky's economic development. To say that these enactments got out-of-hand would be an understatement. Most scholars accept that Kentucky's 1890 Constitutional Convention was necessitated by excessive proliferation of special legislation for the benefit of individual persons and corporations, an unequal tax burden and mounting local public debts, a desire to exercise control over railroads and railroad rates, and the 1850 antebellum constitution's indefensible protections for slavery. See generally Thomas D. Clark, A HISTORY OF KENTUCKY (Ashland, Ky.: The Jesse Stuart Found., 1988), 419-28. This Court has on many occasions recognized the need to curtail special legislation as the primary reason for the 1891 Constitution. See, e.g. , Yeoman v. Commonwealth, Health Policy Bd. , 983 S.W.2d 459, 466 (Ky. 1998) (citing Sheryl G. Snyder & Robert M. Ireland, The Separation of Governmental Powers Under the Constitution of Kentucky: A Legal and Historical Analysis of L.R.C. v. Brown , 73 Ky. L. J. 165 (1984-85) ); Tabler v. Wallace , 704 S.W.2d 179, 183 (Ky. 1985) (stating "[c]oncern for limiting the powers of the legislature in general, and with cutting off special and local legislation in particular, was the primary motivating force behind enactment of the new Kentucky Constitution of 1891[ ]").
To illustrate the problem of special legislation, in its 1888 session, the legislature passed 1,403 local and private acts, which took up 3,146 pages in a three-volume set. 1888 ACTS OF THE GENERAL ASSEMBLY OF THE COMMONWEALTH OF KENTUCKY (Frankfort, *590 KY: John D. Woods, 1888).[13] By contrast, it passed 128 public acts, comprising 217 pages. Id. In 1890, the legislative record was similarly skewed in favor of special or local legislation: 1,726 local or private acts, in 4,703 pages, as opposed to 174 public acts, comprising 174 pages. 1890 ACTS OF THE GENERAL ASSEMBLY OF THE COMMONWEALTH OF KENTUCKY (Frankfort, KY: E. Polk Johnson, 1890). In each of these sessions, local or special acts accounted for over 90% of the total legislation passed.
Some of the special legislation exempted railroads and other corporations from taxation and created monopolies, which were decried by a number of the delegates. E.g. , I 1890 KY. CONST. DEBATES (Frankfort, Ky.: E. Polk Johnson, 1890), 466 (Del. Knott comments). Another point of view was that this legislation had encouraged economic development, expansion of railroads, and development of the state's natural resources. See Clark, A HISTORY OF KENTUCKY , 419-20 (describing editor Henry Watterson and his efforts to promote industrial development).[14] This pro-development point of view was also reflected in the 1890 debates. See IV 1890 KY. CONST. DEBATES , 5014 (Del. Burham comments).[15]
We include these comments not to re-debate the issues of the late nineteenth century, but merely to point out that the framers of the 1891 Constitution were a varied assortment of men, representing different parts of the Commonwealth and economic interests. See Clark, 431 (stating "[t]his fourth convention was composed of as motley a delegation of constitutionalists as had ever been seen in a convention hall.... Farmer members opposed the sinister influence of corporations; and corporation *591 lawyers, lobbyists and self-styled constitutionalists opposed [Farmers'] Alliance leadership[ ]"). Thus, selective quotations from a four-volume set of over 6,000 pages is not a useful exercise in "divining the intent of the framers." Our task, in the interpretation of Kentucky's Constitution,
rests on the express language of the provision, and words must be given their plain and usual meaning. City of Louisville Mun. Hous. Comm'n v. Pub. Hous. Admin. , 261 S.W.2d 286, 287 (Ky. 1953). This Court is "not at liberty to construe ... plain and definite language of the Constitution in such a manner as to thwart the deliberate purpose and intent of the framers of that instrument." Harrod v. Hatcher , 281 Ky. 712, 137 S.W.2d 405, 408 (1940). In fact, our predecessor Court recognized as a "cardinal rule" of constitutional interpretation the principle that rules of construction may not be employed where the language of the provision is clear and unambiguous. Grantz v. Grauman , 302 S.W.2d 364, 366 (Ky. 1957). "It is to be presumed that in framing the constitution great care was exercised in the language used to convey its meaning and as little as possible left to implication[.]" City of Louisville v. German , 286 Ky. 477, 150 S.W.2d 931, 935 (1940).
Fletcher v. Graham , 192 S.W.3d 350, 358 (Ky. 2006).
To demonstrate the point that the 1891 Constitution does not reflect a "pro-labor, populist, progressive" point of view, as argued by the Unions and the Union Amicae , the Convention adopted only three explicitly pro-labor provisions. These sections were Section 243 relating to the minimum age of child labor, Section 244 requiring all wage earners to be paid in lawful money, and Section 253 restricting the labor of penitentiary labor to public works.[16] Other explicitly pro-labor proposals, such as those advocated by the Louisville Trades and Labor Assembly, Unions and Lodges, were not adopted- rejected either in committee or by the Convention: designation of the number of hours that constitute a day's work on public projects; establishment of a Board of Arbitration "with full power to settle all industrial difficulties between employer and employee[;]" and designation of goods and wares manufactured by convict labor. I 1890 KY. CONST. DEBATES , 240 (Trades and Labor Assembly, Unions and Lodges, in the City of Louisville Petition). In addition, the Convention rejected an amendment to Section 243 which would have authorized the legislature to "provide by law for the proper ventilation of mines, the construction of escapements, shafts and such other appliances as may be necessary to protect the health and secure the safety of the workmen therein." I 1890 KY. CONST. DEBATES , 265 (Del. Ramsey Resolution). Equal rights for women, another progressive reform which had been advocated by the Knights of Labor, then a national labor organization with a number of Kentucky locals, were similarly not espoused by the Convention. See II 1890 KY. CONST. DEBATES , 2371-72 (vote tabling provision to grant married women equal property rights). A provision to authorize women's suffrage, likewise, was not adopted in the final document.[17]
*592 The Convention adopted specific sections directed at corporations and railroads. KY. CONST. §§ 190 - 218. These provisions, however, ran to the benefit of the public at large, and were designed to correct the abuses which had occurred as a result of special legislation. See, e.g. , § 194 (requiring all corporations organized or carrying on business in the state to have a place of business and a registered agent); § 197 (prohibiting common carriers from issuing free passes to public officials); § 212 (subjecting railroad rolling stock and personal property to execution and attachment); §§ 213-15, 217-18 (requiring railroads not to discriminate or to give preferential treatment or rates). Similarly, and as to taxation, several provisions addressed special legislation abuses. E.g. , § 174 (subjecting corporate and individually owned property to uniform tax rates); §§ 177, 179 (prohibiting Commonwealth, counties or municipalities from becoming shareholders in corporations).
After the publication of the proposed Constitution in April 1891, the reaction of labor groups was mixed. Herbert Finch, Organized Labor in Louisville, Kentucky, 1880-1914 (1965) (unpublished Ph.D. dissertation, Univ. of Kentucky) (on file with the William T. Young Library, Univ. of Kentucky), 206-07. The Trades and Labor Assembly in Louisville "decided almost unanimously to vote against" the new Constitution. Against the New , THE COURIER-JOURNAL (Louisville), Mon., Jun. 15, 1891, p. 5, col. 4, https://www.newspapers.com/image/32457788/ (visited Sep. 5, 2018). Conversely, the Knights of Labor did endorse it at its annual state convention in July 1891, "by a close vote." Knights' Labor , THE COURIER-JOURNAL (Louisville), Wed., Jul. 29, 1891, p. 8, col. 2, https://www.newspapers.com/image/32461411/ (visited Sep. 5, 2018).
In the final analysis, Dr. Clark has been quoted,
[T]he 1890 convention created a static document to protect [Kentucky's] agrarian society from an emerging industrial order: "One gets the impression ... that many of the delegates were, in fact, little Red Riding Hoods trudging alone and frightened through the perplexing forest of constitutional law, hoping that the big bad wolves of industrial and progressive changes were mere figments of their badly agitated imagination, and that a rigid constitution with static provisions would serve to dispel these threatening wraiths."
William Green, Constitutions , THE KENTUCKY ENCYCLOPEDIA (Lexington: The Univ. Press of Kentucky, 1992), 225 (emphasis added). No doubt exists but that the 1890 Convention sought to rein in the reign of special legislation, i.e , elimination of special tax breaks for railroads, equalization of tax burden, elimination of implied powers. The resulting document was "[n]ot so much a fundamental rule of government as a piece of omnibus legislation." Clark, 432.
C. Federal Labor Law .
With the enactment of major labor laws between 1932 and 1935, Congressional policy towards labor unions transformed from one of indifference (at best) to one of encouragement. These laws were the Norris-LaGuardia Act, c. 90, § 4, 47 Stat. 70 *593 (1932), now codified at 29 U.S.C. § 104 (prohibiting injunctions with respect to any labor dispute)[18] and the Wagner Act, Act of July 5, 1935, 49 Stat. 449, 29 U.S.C. § 151 et seq. (also known as the National Labor Relations Act ("NLRA") ).[19] Following World War II, Congress modified the Wagner Act by the Taft-Hartley Act (also known as the Labor Management Act, 1947), c. 120, § 1, 61 Stat. 136, 29 U.S.C. § 141 et. seq.
By enacting these laws, "Congress largely displaced state regulation of industrial relations," and thus, states "may not regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits." Wis. Dep't of Indus., Labor & Human Relations v. Gould Inc. , 475 U.S. 282, 286, 106 S.Ct. 1057, 1061, 89 L.Ed.2d 223 (1986) (citing San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon , 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959) ). Section 14(b) of the Taft-Hartley Act, however, provides a limited exception:
Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.
29 U.S.C. § 164(b).
The historical context of the relevant aspects of the Taft-Hartley Act is instructive. See Commc'ns Workers v. Beck , 487 U.S. 735, 747, 108 S.Ct. 2641, 2650, 101 L.Ed.2d 634 (1988) ("[T]he structure and purpose of § 8(a)(3) are best understood in light of the statute's historical origins."). Prior to the Taft-Hartley Act, section 8(a)(3) of the NLRA permitted closed shop, union shop, and agency shop agreements. Oil, Chem. & Atomic Workers, Int'l Union v. Mobil Oil Corp. , 426 U.S. 407, 414, 96 S.Ct. 2140, 2144, 48 L.Ed.2d 736 (1976). As typically understood, a closed shop is a type of union-security agreement that requires prospective employees to become union members before commencing employment. Id. at 409 n.1, 96 S.Ct. at 2141 n.1. By contrast, a union shop, which requires employees to join the union after being hired, and an agency shop, which requires employees to make payments to the union after being hired but not to join the union, are less stringent types of union-security agreements. See id. "By 1947, [closed shops] had come under increasing attack," and Congress determined that they should be banned. Beck , 487 U.S. at 748, 108 S.Ct. at 2650. Congress also recognized that prohibiting closed shops could create a free rider problem, i.e. , employees choosing not to contribute financially to the union but still benefiting from the union's actions. See id.
Against this historical backdrop, section 8(a)(3) of the Taft-Hartley Act attempted to accomplish the "twin purposes" of eliminating "the most serious abuses of compulsory unionism ... by abolishing the closed shop" but still allowing certain union-security agreements to counter the *594 free rider problem. NLRB v. Gen. Motors Corp. , 373 U.S. 734, 740-41, 83 S.Ct. 1453, 1458, 10 L.Ed.2d 670 (1963). Specifically, section 8(a)(3) "makes it an unfair labor practice for an employer 'by discrimination in regard to hire or tenure of employment ... to encourage or discourage membership in any labor organization.' " Beck , 487 U.S. at 744, 108 S.Ct. at 2648 (quoting 29 U.S.C. § 158(a)(3) ). "Taken as a whole, § 8(a)(3) permits an employer and union to enter into an agreement requiring all employees to become union members as a condition of continued employment, but the 'membership' that may be so required has been 'whittled down to its financial core.' " Beck , 487 U.S. at 745, 108 S.Ct. at 2648 (footnote omitted) (quoting Gen. Motors , 373 U.S. at 742, 83 S.Ct. at 1459 ).
"While § 8(a)(3) articulates a national policy that certain union-security agreements are valid as a matter of federal law, § 14(b) reflects Congress' decision that any State or Territory that wishes to may exempt itself from that policy." Mobil Oil , 426 U.S. at 416-17, 96 S.Ct. at 2145 (emphasis added). Specifically, § 14(b) "allows a State or Territory to ban agreements requiring membership in a labor organization as a condition of employment. Id. at 417, 96 S.Ct. at 2145 (quotation and footnote omitted). As explained by the Court, § 14(b) "was designed to prevent other sections of the Act from completely extinguishing state power over certain union-security arrangements. And it was the proviso to § 8(a)(3), expressly permitting agreements conditioning employment upon membership in a labor union, which Congress feared might have this result." Retail Clerks Int'l Ass'n, Local 1625 v. Schermerhorn , 373 U.S. 746, 751, 83 S.Ct. 1461, 1464, 10 L.Ed.2d 678 (1963) (footnote omitted); see also Laborers' Int'l Union, Local No. 107 v. Kunco, Inc. , 472 F.2d 456, 458 (8th Cir. 1973) (Section 14(b) "can best be described as an exception to the general rule that the federal government has preempted the field of labor relations regulation.").
With that background, we turn to the claims in this case.
IV. Analysis.
As previously noted, the Unions raise four constitutional challenges to the Act: (a) violation of Kentucky's equal protection of the laws provisions; (b) violation of Kentucky's prohibition on special legislation; (c) violation of Kentucky's prohibition of takings without compensation; and (d) improper designation as emergency legislation. We address each claim in turn.
A. Equal Protection .
Citizens of Kentucky enjoy equal protection of the law under the 14th Amendment of the United States Constitution and Sections 1, 2, and 3 of the Kentucky Constitution. D.F. v. Codell , 127 S.W.3d 571, 575 (Ky. 2003) (citation omitted).[20] Sections 1, 2, and 3 of the Kentucky Constitution provide that the legislature does not have arbitrary power and shall treat all persons equally. "[U]nless a statutory classification is arbitrary, or not founded on any substantial distinction suggesting the necessity or propriety of such legislation, the courts have no right to *595 interfere with the exercise of legislative discretion. Ky. Ass'n of Chiropractors, Inc. v. Jefferson Cnty. Med. Soc'y , 549 S.W.2d 817, 822 (Ky. 1977). As noted earlier, our analysis begins with the presumption that legislative acts are constitutional. United Dry Forces v. Lewis , 619 S.W.2d 489, 493 (Ky. 1981) ; Sims v. Bd. of Educ. , 290 S.W.2d 491, 493 (Ky. 1956) ; Brooks v. Island Creek Coal Co. , 678 S.W.2d 791, 792 (Ky. App.1984). The goal of equal protection provisions is to "keep[ ] governmental decisionmakers from treating differently persons who are in all relevant respects alike." Nordlinger v. Hahn , 505 U.S. 1, 10, 112 S.Ct. 2326, 2331, 120 L.Ed.2d 1 (1992). However, because nearly all legislation differentiates in some manner between different classes of persons, neither the federal nor state constitutions forbid such classification per se. Romer v. Evans , 517 U.S. 620, 631, 116 S.Ct. 1620, 1627, 134 L.Ed.2d 855 (1996). Accordingly, the level of judicial scrutiny applied to an equal protection challenge depends on the classification made in the statute and the interest affected by it. See Mem'l Hosp. v. Maricopa Cnty. , 415 U.S. 250, 253, 94 S.Ct. 1076, 1080, 39 L.Ed.2d 306 (1974).
Currently, three levels of review may apply to an equal protection challenge. See, e.g. , Steven Lee Enters. v. Varney , 36 S.W.3d 391, 394-95 (Ky. 2000). Strict scrutiny applies whenever a statute makes a classification based on a "suspect" class. See Codell , 127 S.W.3d at 575-76 (discussing strict scrutiny). In Varney , for example, we noted race, alienage, and ancestry as suspect classes. 36 S.W.3d at 394. In such cases, or when a statute affects a fundamental right, a statute is "sustainable only if [it] is suitably tailored to serve a 'compelling state interest.' " Id. (citation omitted). The next level of analysis, heightened rational basis scrutiny, applies to quasi-suspect classes, such as gender or illegitimacy. Id. Under this standard, "discriminatory laws survive equal protection analysis only 'to the extent they are substantially related to a legitimate state interest.' " Id. (quoting City of Cleburne v. Cleburne Living Ctr., Inc. , 473 U.S. 432, 441, 105 S.Ct. 3249, 3255, 87 L.Ed.2d 313 (1985) ). On the other hand, a statute that "merely affects social or economic policy ... is subject" to a less searching form of judicial scrutiny, i.e. the "rational basis" test. Codell , 127 S.W.3d at 575 (citation omitted).
Rational basis review is appropriate for evaluating the Act since the Act is expressly permitted by the Taft-Hartley Act § 14(b). The Supreme Court long ago held that, under federal law, union membership is not a suspect classification triggering strict scrutiny. City of Charlotte v. Local 660, Int'l Ass'n of Firefighters , 426 U.S. 283, 286, 96 S.Ct. 2036, 2038, 48 L.Ed.2d 636 (1976). The result is the same under Kentucky case law, which recognizes that statutes relating to labor and labor organizations are proper objectives for exercise of the Commonwealth's police power. Hamilton v. Int'l Union of Operating Eng'rs , 262 S.W.2d 695, 700 (Ky. 1953) ; see also Ky. Harlan Coal Co. v. Holmes , 872 S.W.2d 446, 451 (Ky. 1994), abrogated on other grounds by Vision Mining, Inc. v. Gardner , 364 S.W.3d 455 (Ky. 2011) (stating "the Commonwealth's power to legislate public policy in the area of employer/employee relations derives from its police power[ ]"); Commonwealth v. Reinecke Coal Min. Co. , 117 Ky. 885, 894, 79 S.W. 287, 289-90 (1904) (statute relating to timely payment of coal miners and forbidding blacklisting of employees was valid exercise of police power). Furthermore, "[t]he essential predicate of the police power is the health, morals, safety, and general welfare of the people."
*596 Jones v. Russell , 224 Ky. 390, 392, 6 S.W.2d 460, 461 (1928). The legislature "in making police regulations has the right to make classifications based upon natural and reasonable distinctions, but is without right to exercise the power to classify arbitrarily and without any reasonable basis inherent in the objects of the classification." Id. at 393, 6 S.W.2d at 461. A statute complies with Kentucky equal protection requirements if a "rational basis" supports the classifications that it creates. Elk Horn Coal Corp. v. Cheyenne Res., Inc. , 163 S.W.3d 408, 418-19 (Ky. 2005) (citation omitted); Waggoner v. Waggoner , 846 S.W.2d 704, 707 (Ky. 1992) (citation omitted).
In Varney , we quoted at length from Heller v. Doe by Doe , 509 U.S. 312, 319-21, 113 S.Ct. 2637, 2642-43, 125 L.Ed.2d 257 (1993), as "[t]he best summary of what rational basis analysis entails and what it does not entail[:]"
We many times have said, and but weeks ago repeated, that rational-basis review in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. Nor does it authorize the judiciary to sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines. For these reasons, a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity. Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose. Further, a legislature that creates these categories need not actually articulate at any time the purpose or rationale supporting its classification. Instead, a classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.
A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification. A legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data. A statute is presumed constitutional, and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record. Finally, courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality. The problems of government are practical ones and may justify, if they do not require, rough accommodations-illogical, it may be, and unscientific.
Varney , 36 S.W.3d at 395 (internal quotations and ellipses omitted).
In Elk Horn Coal , we explained that the statute under consideration, KRS 26A.300, did not treat all unsuccessful appellants the same, and thus was "discriminatory. But the state may discriminate in certain matters if there is a rational basis for such discrimination." 163 S.W.3d at 413. As previously noted, "[i]n areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against an equal protection challenge if ... any reasonably conceivable state of facts ... could provide a rational basis for *597 the classification." Id. (quotation and footnote omitted);[21] see also Popplewell's Alligator Dock No. 1, Inc. v. Revenue Cabinet , 133 S.W.3d 456, 466-67 (Ky. 2004) (upholding sales and use tax exemption for gasoline sales for industrial-type commercial vessels); Commonwealth v. Howard , 969 S.W.2d 700, 703-04 (Ky. 1998) (upholding juvenile DUI statute which imposes lower blood alcohol level for drivers under 21 years of age).
In Delta Air Lines, Inc. v. Commonwealth, Revenue Cabinet , in upholding a sales and use tax classification, we held:
The standards for classifications under the Kentucky constitution are the same as those under the Fourteenth Amendment to the Federal constitution. A single standard can be applied to both the State and Federal constitutions in regard to classification for sales tax exemptions. This Court has determined that economic factors are valid considerations which the legislature may take into account in developing a legitimate tax classification. The legislature has a great freedom of classification and the presumption of validity can be overcome only by the most explicit demonstration that it is hostile and oppressive against particular persons and classes.
689 S.W.2d 14, 18 (Ky. 1985) (citations omitted). "A classification by the legislature should be affirmed unless it is positively shown that the classification is so arbitrary and capricious as to be hostile, oppressive and utterly devoid of rational basis." Id. at 19.
The Unions and the Union Amicae strenuously argue that the Act creates a classification which has no substantial or justifiable basis. They claim right-to-work policies reduce wages for union and non-unions employees, have mixed impact on employment outcomes, and have no statistically significant impact on overall state employment. They argue the true motivation is "to starve labor organizations and their members based on perceived political bent." The Commonwealth, conversely, argues that the legislature reasonably could conclude that the Act would, as testified by the proponents of 2017 HB 1, benefit Kentucky and its citizens by joining other right-to-work states with superior economic development, employment growth in both union and non-union jobs, and eliminate Kentucky's disadvantage with respect to its neighboring right-to-work states in competing to attract new businesses. The Commonwealth further argues that the legislature might have sought to provide economic freedom for workers who desired not to support any union activities.
The legislature is permitted to set the economic policy for the Commonwealth. Even assuming that the Act creates a classification that discriminates between labor unions and all other organizations operating in the state,[22] or *598 any sort of classification among union and non-union workers, we are unable to say that the legislature did not have a reasonable basis for so doing. As stated in Varney , "[a] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." 36 S.W.3d at 395. The legislature clearly established a rational basis for the Act: to promote economic development, to promote job growth, and to remove Kentucky's economic disadvantages in competing with neighboring states. Additionally, and even though not required, the proponents of the Act tendered empirical evidence to support the claimed benefits.
One does not need an advanced degree in labor economics to recognize that employers might be attracted to locate in a state where wages are lower as opposed to a state where wages are higher. To the extent this conclusion might be characterized as speculative, it is undoubtedly rational. The legislature can clearly make a policy decision that the Act might result in more jobs, albeit at lower wages, and that this result, in turn, might benefit the overall economic climate of Kentucky. In fact, this result is supported by some of the economic studies noted by the Unions. See Robert Bruno, Affidavit at 5 (stating that some studies suggest right to work laws increase manufacturing employment, while other studies find no effect). All the while, of course, for any given workplace, the majority of workers retain the federally-protected right to organize.
The Act does not violate the equal protection provisions of the Kentucky Constitution. We are unable to say the legislature's "classification is so arbitrary and capricious as to be hostile, oppressive and utterly devoid of rational basis." Delta Air Lines , 689 S.W.2d at 19. To the extent the Unions claim they will be prohibited from collecting a fee for legally-protected, legally authorized services, that claim is addressed, infra , in our discussion on Taking for Public Purpose without Just Compensation .
As to the Unions' claim that the Act impairs their freedom to contract, Kentucky law has long recognized that the police power, based on "the general welfare of the community," may validly infringe on the right to contract. City of Covington v. Sanitation Dist. No. 1 , 301 S.W.2d 885, 888 (Ky. 1957). "The exercise of such a power must be reasonable and in conformity with the necessity of the case *599 and have a substantial basis for the action." Id. at 889. Based on our previous discussion concerning the legislature's stated reasons for enacting the Act, we hold that its enactment satisfies this test.
B. Special Legislation.
The Unions claim the Act constitutes special legislation in violation of Sections 59 and 60 of the Kentucky Constitution. Specifically, Section 59 states: "[t]he General Assembly shall not pass local or special acts concerning any of the following subjects, or for any of the following purposes, namely: ... Twenty-fourth: To regulate labor, trade, mining or manufacturing." The purpose of this section is not to prevent the legislature from enacting any laws concerning labor, trade, mining or manufacturing. That would be absurd.[23] Rather, the intent is for any acts touching these subjects be general acts. See, e.g. , Waggoner , 846 S.W.2d at 706-07 (stating "[t]he fact that the [legislature] deals with a special subject does not per se make it special legislation[ ]"); D.E. Hewitt Lumber Co. v. Brumfield , 196 Ky. 723, 727, 245 S.W. 858, 860 (1922) (holding that § 59"inhibitions apply only to local and special legislation, and therefore do not apply here unless the [Workers'] Compensation Act is either a local or a special act[ ]"). Furthermore, we note the purpose of these sections is to "prevent special privileges, favoritism, and discrimination, and to ensure equality under the law ... [and to] prevent the enactment of laws that do not operate alike on all individuals and corporations." Louisville/Jefferson Cnty. Metro Gov't v. O'Shea-Baxter, LLC , 438 S.W.3d 379, 383 (Ky. 2014) (quotations and citations omitted).
Special legislation is defined as arbitrary and irrational legislation that favors the economic self-interest of the one or the few over that of the many. Yeoman , 983 S.W.2d at 468. "Local" or "special" legislation applies exclusively to special or particular places, or special and particular persons, and is distinguished from a statute intended to be general in its operation, and that relates to classes of persons or subjects. More specifically, "[a] 'local law' is one whose operation is confined within territorial limits other than those of the whole state, or any properly constituted class or locality therein." Ravitz v. Steurele , 257 Ky. 108, 115, 77 S.W.2d 360, 364 (1934). Here, the Act is clearly not a local act because its application is statewide.
In Johnson v. Commonwealth ex rel. Meredith , our predecessor court noted a clear distinction between a general and a special law, stating " '[a] statute which relates to persons or things as a class is a general law, while a statute which relates to particular persons or things of a class is special.' " 291 Ky. at 837, 165 S.W.2d at 825 (quoting State ex rel v. Tolle , 71 Mo. 645, 650 (1880) ); see also Ravitz , 257 Ky. 108, 77 S.W.2d 360 ; Stevenson v. Hardin , 238 Ky. 600, 603, 38 S.W.2d 462, 463-64 (1931) (law excepting party nominations from mandatory primary held to be general law as applying to all statewide officers- "general in its application and applies in an equal manner to all persons similarly situated"). In Johnson , the issue concerned the authorization of all executive departments of the state to employ a *600 certain class of professional assistants. The court opined that it "can conceive nothing more foreign to special legislation" than this statute. 291 Ky. at 837, 165 S.W.2d at 825.
Our case law has long recognized a simple, two-part test for determining whether a law constitutes general legislation in its constitutional sense: (1) equal application to all in a class, and (2) distinctive and natural reasons inducing and supporting the classification. Yeoman , 983 S.W.2d at 466 ; Waggoner , 846 S.W.2d at 707 ; Schoo v. Rose , 270 S.W.2d 940 (Ky. 1954) ; Droege v. McInerney , 120 Ky. 796, 87 S.W. 1085 (1905) ; Safety Bldg. & Loan Co. v. Ecklar , 106 Ky. 115, 50 S.W. 50 (1899) ; see also Burrow v. Kapfhammer , 284 Ky. 753, 761-62, 145 S.W.2d 1067, 1072 (1940) (holding unconstitutional hour and wages law which applied to restaurants employing waiters, but not to hotel dining room waiters).
Frankly, the Act applies to all collective bargaining agreements entered into on or after January 9, 2017, with the exception of certain employees covered or exempted by federal law. KRS 336.132. With the exceptions required by federal law, it applies to all employers and all employees, both public and private. It does not single out any particular union, industry or employer. It applies statewide. We have previously rejected constitutional challenges to legislation that purportedly promoted or harmed organized labor as claimed special legislation, so long as a rational basis existed for the statute. See Hamilton , 262 S.W.2d at 700. And in Waggoner , we stated "[t]he responsibility of this Court is to draw all reasonable inferences and implications from the act as a whole and thereby sustain its validity." 846 S.W.2d at 707 (citing Graham v. Mills , 694 S.W.2d 698 (Ky. 1985) ). In Tabler , we required that "a substantial and justifiable reason [must appear] from legislative history, from the statute's title, preamble or subject matter, or from some other authoritative source." 704 S.W.2d at 186. The legislature clearly established a rational basis for the Act: to promote economic development, to promote job growth, and to remove Kentucky's economic disadvantages in competing with neighboring states. As noted above, testimony supporting the legislation was presented at House committee hearings in January 2017. The Unions and Union Amicae , as noted, disagree, but we are unable to say that the legislature's rationale is unreasonable.[24]
C. Taking for Public Purpose without Just Compensation .
Next, the Unions argue that the Act constitutes a public taking of labor union property without just compensation, in violation of Sections 13 and 242 of the Kentucky Constitution. Section 13 provides, in pertinent part, that no "man's property [shall] be taken or applied to public use without the consent of his representatives, and without just compensation being previously made to him." Section 242 provides:
Municipal and other corporations, and individuals invested with the privilege of taking private property for public use, shall make just compensation for property taken, injured or destroyed by them; which compensation shall be paid before such taking, or paid or secured, at the election of such corporation or *601 individual, before such injury or destruction.
The Unions' argument is two-fold. First, they assert that the Act takes union property because unions are required to provide valuable services to all employees in a bargaining unit irrespective of union membership without being compensated in return.[25] Second, they maintain the Act takes from unions without compensation their valuable contract right that all employees share in the cost of representation in future renewals of collective bargaining agreements. We address these arguments in turn.
1. Providing required service without compensation.
The Unions rely on this court's decision in Bradshaw v. Ball , 487 S.W.2d 294 (Ky. 1972) (a case arising out of an attorney being required to represent an indigent criminal defendant) in support of their argument that a requirement to provide a valuable service without compensation constitutes an unconstitutional taking. The Unions analogize that the Bradshaw principle-no one can be required under the Kentucky Constitution to provide valuable services without compensation-applies to union services representing nonmembers, for such items as negotiating and administering contracts, handling employee grievances, including arbitration, arbitration fees, attorney fees, union representatives' salaries, hearing room costs, court reporters, and other associated expenses. Assuming, arguendo, that Bradshaw stands for that proposition, and no other,[26] the Supreme Court's analysis of *602 the "free-rider problem" in its recent decision in Janus v. Am. Fed'n of State, Ctny., & Mun. Emps., Council 31 , --- U.S. ----, 138 S.Ct. 2448, 201 L.Ed.2d 924 (2018)[27] conclusively refutes, for several reasons, the Unions' claim that they will be compelled to provide services without compensation.
The Court addressed the arguments advanced to justify non-members' payment of agency fees, specifically that because unions are required by law to represent the interests of all employees in the bargaining unit, whether union members or not, it is unfair that non-members, i.e. , free-riders, are not required to pay fees. The Court noted that unions in many states represent employees who do not pay agency fees. Id. at 2467. No union is compelled to seek designation as exclusive representative, but such designation is avidly sought.[28] Id. First, such designation provides a union with a privileged place over wages, benefits, and working conditions. In the collective bargaining process, the union has the exclusive right to speak for all employees and an employer is required to listen to the union and negotiate in good faith. The designation results in a tremendous increase in power of the union. Id. (citing Am. Commc'n Ass'n v. Douds , 339 U.S. 382, 401, 70 S.Ct. 674, 686, 94 L.Ed. 925 (1950) ). Second, the union is granted special privileges in obtaining information about employees and having fees and dues deducted directly from wages. Id. As noted by the Court, these benefits greatly outweigh any extra burden imposed by the duty of fair representation for nonmembers, and the duty of fair representation does not significantly increase expenses that the unions would otherwise bear in negotiating collective bargaining agreements. Id. at 2467-68. Pertinently, and as to representation of nonmembers in grievance proceedings, the Court stated "[u]nions do not undertake this activity solely for the benefit of nonmembers[.]" Id. at 2468. A union sends a representative to the proceedings to further its
interest in keeping control of the administration of the collective bargaining agreement, since the resolution of one *603 employee's grievance can affect others. And when a union controls the grievance process, it may, as a practical matter, effectively subordinate the interest of [an] individual employee to the collective interests of all employees in the bargaining unit.
Id. (quotations and citations omitted); see also Vaca v. Sipes , 386 U.S. 171, 190-94, 87 S.Ct. 903, 916-19, 17 L.Ed.2d 842 (1967) (holding that individual employee has no absolute right to have grievance taken to arbitration; breach of duty of fair representation is sustained only by proof of "arbitrary or bad-faith conduct on the part of the Union in processing [a] grievance[ ]").
Other courts have similarly held that unions are fully and adequately compensated for any loss of fees from nonmembers through the exclusive representation designation. Sweeney v. Pence , 767 F.3d 654, 666 (7th Cir. 2014) (upholding Indiana's right-to-work law against federal Fifth Amendment takings claim); Int'l Union of Operating Eng'rs Local 370 v. Wasden , 217 F.Supp.3d 1209, 1223-24 (D. Idaho 2016) (upholding Idaho's right-to-work law against federal Fifth Amendment takings claim); Int'l Union of Operating Eng'rs Local 139 v. Schimel , 210 F.Supp.3d 1088, 1096-97 (E.D. Wis. 2016) (upholding Wisconsin's right-to-work law against federal Fifth Amendment takings claim), aff'd 863 F.3d 674 (7th Cir. 2017) ; see also Zoeller v. Sweeney , 19 N.E.3d 749, 753 (Ind. 2014) (upholding Indiana's right-to-work law against state constitutional takings challenge on the basis that "[t]he Union's federal obligation to represent all employees in a bargaining unit is optional; it occurs only when the union elects to be the exclusive bargaining agent, for which it is justly compensated by the right to bargain exclusively with the employer[ ]").
The foregoing analysis applies equally to private sector employees and effectively distinguishes the present case from Bradshaw . A union's representation of a nonmember employee through collective bargaining or grievance processing serves the union's interest, irrespective of whether it receives an agency fee. A union is not "compelled" by the Act to represent nonmembers without compensation. By contrast, the uncompensated attorney receives nothing for his or her time and effort. Because exclusive designation fully and adequately compensates unions for free-riders, the Act does not constitute a taking of private property without compensation, and therefore does not violate Sections 13 and 242 of the Kentucky Constitution.
2. Taking of a Contract Right in Future Renewals.
The Unions do not spend too much time on this argument, presumably because the Act effectively carves out current contracts and will apply only to renewals of collective bargaining agreements. The Unions, however, argue that unions have negotiated for decades over union security clauses, have an expectation that these provisions will continue and that collective bargaining agreements are different from regular commercial contracts. We disagree.
Section 14(b) of the Taft-Hartley Act has been part of the NLRA since 1947. Congress has for 70 years expressly permitted states to enact right-to-work laws. Right-to-work legislation has been proposed in Kentucky for almost 20 years. We fail to perceive that any expectation in the continuation of a union security clause could be a reasonable expectation. See Morrisey v. West Virginia AFL-CIO , 239 W.Va. 633, 804 S.E.2d 883, 892 (2017) (holding that no protected property interest exists in future agreements that have not been negotiated or accepted; "unions have only a unilateral *604 expectation that they will receive fees from nonunion employees" in the future).
The Commonwealth correctly argues that Kentucky law has long recognized that the police power, based on "the general welfare of the community," may validly infringe on the right to contract. City of Covington v. Sanitation Dist. No. 1 , 301 S.W.2d at 888. As we noted above, "[t]he exercise of such a power must be reasonable and in conformity with the necessity of the case and have a substantial basis for the action." Id. at 889. Based on our previous discussion regarding the legislature's stated reasons for enacting the Act, we hold the Act satisfies this test.
D. Emergency Legislation .
Finally, the Unions argue that the legislature impermissibly designated the Act as emergency legislation in violation of Section 55 of the Kentucky constitution, and that the trial court erred by failing to consider this argument. The trial court reasoned that the court is not the proper body to determine whether the stated emergency existed, and that the legislature is merely required to state an emergency purpose. This constitutional section states:
No act, except general appropriation bills, shall become a law until ninety days after the adjournment of the session at which it was passed, except in cases of emergency, when, by the concurrence of a majority of the members elected to each House of the General Assembly, by a yea and nay vote, entered upon their journals, an act may become a law when approved by the Governor; but the reasons for the emergency that justifies this action must be set out at length in the journal of each House.
KY. CONST. § 55. The reason set forth in the Act was that "it is critical to the economy and citizens of Kentucky to attract new business and investment into the Commonwealth as soon as possible, an emergency is declared to exist, and this Act takes effect upon its passage and approval by the Governor or upon its otherwise becoming a law." 2017 Ky. Acts ch. 1, § 14.
In Am. Ins. Ass'n v. Geary , 635 S.W.2d 306, 307 (Ky. 1982), we held that while a legislative determination of emergency is subject to judicial review, "legislative judgment in that respect must be accorded the same presumption of validity that it enjoys in other instances of constitutional inquiry." Thus, if "any rational basis for concluding that the circumstances cited as constituting an emergency justified more expeditious action than would ordinarily be true, the courts should not interfere with the legislative discretion." Id. And, "when the reason for declaring an emergency is sufficiently expressed in the legislation itself, the requirement that it be recited in the journal is satisfied." Id.
In this case, and although the Unions disagree, we are unable to conclude that the legislature's proffered reason for an emergency has no rational basis. We therefore will not disturb that determination.[29]
*605 V. Conclusion.
Based on the foregoing reasons, we hold that the Unions' constitutional challenges to the Act are without merit. In this area of economic legislation, the legislature and the executive branch make the policy, not the courts. Long ago, in an opinion upholding a provision of the Railway Labor Act that authorized a union shop agreement notwithstanding a state's right-to-work law, Justice William O. Douglas aptly wrote, "[m]uch might be said pro and con if the policy issue were before us." Ry. Emps. Dep't v. Hanson , 351 U.S. 225, 233, 76 S.Ct. 714, 719, 100 L.Ed. 1112 (1956). But, he continued,
the question is one of policy with which the judiciary has no concern.... [The legislature], acting within its constitutional powers, has the final say on policy issues. If it acts unwisely, the electorate can make a change. The task of the judiciary ends once it appears that the legislative measure adopted is relevant or appropriate to the constitutional power which [the legislature] exercises.
Id. at 234, 76 S.Ct. at 719 (emphasis added).[30] We therefore AFFIRM the Franklin Circuit Court's Order dismissing the complaint.
All sitting. Minton, C.J., Hughes and Venters, JJ., concur. Minton, C.J., concurs by separate opinion in which Hughes and Venters, JJ., join. Keller, J., dissents by separate opinion in which Cunningham and Wright, JJ., join. Wright, J., dissents by separate opinion in which Cunningham and Keller, JJ., join.

United States Code.

House Bill.

Kentucky Revised Statutes.

2000 HB 12; 2003 Senate Bill ("SB") 77; 2004 HB 173; 2005 SB 205; 2006 HB 38; 2007 HB 328; 2009 SB 165; 2011 HB 345; 2013 HB 308; 2014 HB 496; 2015 SB 1; 2016 SB 3. Legislative Research Commission, http://www.lrc.ky.gov/ (last visited Aug. 30, 2018). Our research uncovered no version of the bill in the biennial sessions 1986 through 1998.

The House Committee hearing was accessible on KET (Part 1: https://www.ket.org/legislature/?archive& program=WGAOS& nola=WGAOS+018003& part=1& epoch=2017; Part 2: https://www.ket.org/legislature/?archive& program=WGAOS& nola=WGAOS+018003& part=2& epoch=2017) (last visited Aug. 30, 2018). Witnesses in favor of the Bill were Governor Bevin, Speaker of the House Jeff Hoover, Majority Whip Jonathan Shell, David Adkisson, President & CEO of the Kentucky Chamber of Commerce, Kevin Grove, an executive with CBRE, a commercial real estate firm in Louisville, and Julia Crigler, state director for Americans For Prosperity, Kentucky chapter. Witnesses opposing the Bill were Anna Baumann, policy analyst for the Kentucky Center of Economic Policy, whose affidavit was attached to Appellants' brief in this Court, and Bill Londrigan, one of the plaintiffs/appellants herein.

This quotation recited in the hearing appears to come from Jeffrey A. Eisenach, Right-to-Work Laws: The Economic Evidence , NERA Economic Consulting, http://www.nera.com/content/dam/nera/publications/2015/PUB_Right_to_Work_Laws_0615.pdf (last visited Sep. 21, 2018). The quoted private sector employment growth rate, 17.4%, in right-to-work states compared with the comparable rate, 8.2%, in non-right-to-work states.

Louisiana State University.

Except for the Act's designation as emergency legislation, purportedly in violation of Ky. Const. § 55, no claim is made that the Act's passage and enactment did not comport with the requirements of the Constitution for a valid law.

The plaintiffs/appellants are Fred Zuckerman and William Londrigan, as representatives respectively of the General Drivers, Warehousemen and Helpers Local Union No. 89 and the Kentucky State AFL-CIO, Affiliated Unions and their Members (collectively "the Unions").

The defendants/appellees are Office of the Governor, ex. rel. Matthew G. Bevin, in his official capacity as Governor, and the Commonwealth of Kentucky, Kentucky Labor Cabinet, ex rel. Derrick K. Ramsey, in his official capacity as Secretary of the Kentucky Labor Cabinet (collectively "the Commonwealth").

Kentucky Rules of Civil Procedure.

E.g. , Appellants' Brief at 11, Union Amicae's Brief at 1-5, 7. We recognize the importance of labor unions in United States' history and that of Kentucky. We acknowledge that unions have played a significant role in providing a path for many working families to the middle class, for improving working conditions and pay, for general acceptance of the forty-hour work week, and for other benefits. In 1933, our predecessor court had recognized the important function of labor unions:
the rights of economic self-preservation; of improving economic and social conditions; of agreement among men; of free speech and action; of pursuing one's safety and happiness; of striving to achieve legitimate ends and benefits by concert of action or collective bargaining; and the privilege of assembling together in a peaceable manner for the common good. Upon this side may be placed also the unconscionable sweatshops and lamentable conditions under which employees are all but compelled to work-those things which challenge an enlightened, humane society to opposition.
Music Hall Theatre v. Moving Picture Mach. Operators Local No. 165 , 249 Ky. 639, 642, 61 S.W.2d 283, 284-85 (1933).
The issues in this case, however, are not whether unions are beneficial organizations, but whether the legislature's passing of the Act violated any provision of the Kentucky Constitution as argued by the Unions and the Union Amicae .

These numbers come from the table of contents of the Kentucky Acts' volumes. Interestingly, a number of the Public Acts had a decidedly local or restricted impact. See, e.g. , 1888 Ky. Acts ch. 632 (amending Ky. Gen. Stat. ch. 70, § 6 to increase from sixty days to six months the time period in which to file a mechanics' lien, but such amendment applied only to Madison County); 1888 Ky. Acts ch. 650 (exempting the Nicholasville, Danville and Lancaster Turnpike Company from the provisions of 1886 Ky. Acts ch. 1127 (requiring State's Sinking Fund Commissioners to approve the directors of a turnpike company in which the State of Kentucky owned stock) ); 1888 Ky. Acts ch. 1347 (amending Ky. Gen. Stat. ch. 106, art. 2, § 3 (relating to taverns, tippling-houses, etc.), but such amendment applied only to Madison County).

To quote Dr. Clark:
Henry Watterson and his "new departure" Democrats were diligent on the behalf of new industry. In Louisville, Watterson took the lead in pointing out new and profitable industrial opportunities. Boards of commerce distributed thousands of circulars at home and abroad describing Kentucky's resources and proclaiming Kentucky a land of unlimited business promise. Using the state's credit to encourage corporations was too unusual, however, for conservative agrarian legislators, and enthusiastic "new departure" partisans had to content themselves with granting generous tax exemption and special privileges. This encouragement to capital was soon noticeable, for railway mileage increased from 567 miles built and projected in 1860, to more than 1,500 miles in operation, in 1880. These roads represented a stated capital investment of $100,000,000. Along with the expansion of the Kentucky railway system, eastern capital poured into the state to develop timber and coal resources, and to build distilleries and tobacco warehouses.
Clark, A History of Kentucky , at 420.

Burnam stated:
I would hold these corporations to their just responsibility for every infraction of private right or public law, but I shall never consent by my vote, in obedience to popular clamor, to strike down those great benefactors of the Commonwealth ... which are daily and hourly giving employment and to thousands of laborers, who have linked with bands of iron the different portions of the country, and strengthened and consolidated the power, the civilizations and true greatness of the human race.

Prior to 1891, neither the constitution nor statutes limited where convict labor could be employed. Employers therefore could lease convict labor to lower wages or to take the place of free, striking workers. See Henry C. Mayer, Glimpses of Union Activity among Coal Miners in Nineteenth-Century Eastern Kentucky , 86 Reg. of the Ky. Hist. Socy 216, 220 (1988).

Laura Clay, leader of the women's suffrage in Kentucky and daughter of Cassius Marcellus Clay, the "Lion of White Hall," was permitted to address the Convention. Her plea was not for recognition of women's suffrage as a constitutional right, but merely for a provision authorizing the legislature to enact women's suffrage "when the time shall come." II 1890 Ky. Const. Debates 2090-93. This limited provision was not included in the drafted Constitution; Section 145 limited suffrage to "[e]very male citizen ... of the age of twenty-one." In 1912, the legislature authorized women to vote in elections for county school superintendents, as authorized by Ky. Const. § 155. Crook v. Bartlett , 155 Ky. 305, 159 S.W. 826 (1913).

Section 2 of the Norris-LaGuardia Act contains a broad declaration of public policy and of the need to protect workers in joining unions, pursuing collective bargaining and resorting to concerted activities. 29 U.S.C. § 102.

An earlier law, the National Industrial Recovery Act ("NIRA"), c. 90, 48 Stat. 195, 196 (1933); 15 U.S.C. § 703, also contained provisions encouraging unionization. The basic statute, however, was declared unconstitutional. A.L.A. Schechter Poultry Corp. v. United States , 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935). Unlike the NIRA, the Wagner Act's constitutionality was upheld. NLRB v. Jones & Laughlin Steel Corp. , 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937).

The Unions make no claim under the 14th Amendment. That provision requires persons who are similarly situated to be treated alike. Federal courts have held that right-to-work laws do not violate any provision of the United States Constitution. Lincoln Fed. Labor Union No. 19129, A.F. of L. v. N.w. Iron & Metal Co. , 335 U.S. 525, 69 S.Ct. 251, 93 L.Ed. 212 (1949) ; Am. Fed'n of Labor v. Am. Sash & Door Co. , 335 U.S. 538, 69 S.Ct. 258, 93 L.Ed. 222 (1949) ; see, e.g. , Sweeney v. Daniels , No. 2:12CV81-PPS/PRC, 2013 WL 209047 at *8 (N.D. Ind. 2013), aff'd sub nom. Sweeney v. Pence , 767 F.3d 654 (7th Cir. 2014).

In Elk Horn Coal , we acknowledged that, on occasion based on particular facts, we had elected to apply a higher level of scrutiny to equal protection analysis in cases involving social and economic legislation. 163 S.W.3d at 418 nn. 43-44 (citing Tabler , 704 S.W.2d at 186-87 as requiring substantial and justifiable reason for discriminatory legislation). A cursory reading of Tabler , however, discloses that the decision addressed the prohibition of special legislation in sections 59 and 60 of the Kentucky Constitution, specifically section 59(5) regulating limitation of civil causes. In Elk Horn Coal , we declined to address this "heightened" standard because of our view that the legislation in question failed even the rational basis test as "arbitrary and irrational." 163 S.W.3d at 421.

We reject the Unions' analogy that labor unions are akin to the Kentucky Bar Association ("KBA") for purposes of the Act. Historically, labor unions, as opposed to trade or craft unions, arose as associations of workers/employees to improve pay and working conditions and to provide a unified group to assert rights against their employer. See Music Hall Theatre , 249 Ky. at 642, 61 S.W.2d at 284-85. These same functions are largely served today through an overlay of federal law and collective bargaining agreements. Unions are voluntary organizations, even in non-right-to-work states. The KBA, by contrast, exists by virtue of the state constitution. See Ky. Const. § 116 (requiring the Kentucky Supreme Court to "by rule, govern admission to the bar and the discipline of members of the bar[ ]"). The KBA's purpose is
to maintain a proper discipline of the members of the bar in accordance with these rules and with the principles of the legal profession as a public calling, to initiate and supervise, with the approval of the court, appropriate means to insure a continuing high standard of professional competence on the part of the members of the bar, and to bear a substantial and continuing responsibility for promoting the efficiency and improvement of the judicial system.
Kentucky Rules of the Supreme Court ("SCR") 3.025. The KBA is not a voluntary association, SCR 3.030(1), except in the sense that no one is required to practice law in Kentucky. The essential tenor of SCR 3.025 is that the KBA exists for the protection of the public: "proper discipline ... of the bar," "high standard of professional competence" and "efficiency and improvement of the judicial system[.]"

If the meaning were to prohibit all laws addressing these subjects, then entire Titles of the Kentucky Revised Statutes would be void. E.g. , KRS Title XXVII: Labor and Human Rights; KRS Title XXVII: Mines and Minerals; KRS Title XXIX: Commerce and Trade. Examples of Chapters within these titles are KRS Chapter 341, Unemployment Compensation; KRS Chapter 350, Surface Coal Mining; and KRS Chapter 355, Uniform Commercial Code.

The concurring in part/dissenting in part opinion seems to suggest that any time the legislature seeks to alter any policy yet grandfather pre-existing rights, duties or obligations, then the resulting legislation is constitutionally infirm under Sections 59 and 60. Such analysis ignores the longstanding case law cited in this opinion that establishes the two-part test for analyzing legislation under a special legislation challenge, and would severely hinder any legislative effort to effect change in socio-economic policy.

A union's duty of fair representation arises from its statutory designation as the exclusive representative of the bargaining unit and has been established by case law. See, e.g. , Steele v. Louisville & Nashville R. Co. , 323 U.S. 192, 198-99, 65 S.Ct. 226, 230, 89 L.Ed. 173 (1944). However, under the duty of fair representation, a union retains broad discretion. In Air Line Pilots Ass'n, Int'l v. O'Neill , 499 U.S. 65, 67, 111 S.Ct. 1127, 1130, 113 L.Ed.2d 51 (1991), the Court held that
the rule announced in Vaca v. Sipes , 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967) -that a union breaches its duty of fair representation if its actions are either "arbitrary, discriminatory, or in bad faith"-applies to all union activity, including contract negotiation. We further hold that a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a "wide range of reasonableness," Ford Motor Co. v. Huffman , 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953), as to be irrational.

A careful reading of Bradshaw demonstrates that its holding must be considered in the historical and factual context in which it was decided. All Kentucky cases regarding attorneys' representation of indigent defendants prior to Bradshaw held that, as officers of the court, attorneys were expected to perform these services as a collateral function of the profession. E.g. , Slavens v. Commonwealth , 481 S.W.2d 650 (Ky. 1972) ; Jones v. Commonwealth , 457 S.W.2d 627 (Ky. 1970) ; Warner v. Commonwealth , 400 S.W.2d 209 (Ky. 1966). However, as federal criminal procedural rights were being expanded by cases such as Gideon v. Wainwright , 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), this court became increasingly concerned that the time and knowledge required to represent indigent criminal defendants effectively was reaching a crisis point, stating "[b]ecause of the increased crime rate and the expansion by U.S. Supreme Court decisions of new federal constitutional standards to the administration of criminal justice in the state courts, an intolerable burden has been thrust particularly upon the younger members of the legal profession." Bradshaw , 487 S.W.2d at 297. Specifically, we noted that "attorneys cannot constitutionally be compelled to serve as counsel without compensation, in circumstances where the burden of such service will amount to a substantial deprivation of property." Id. at 298. However, an additional very significant constitutional right that permeates the opinion is the right of an accused to effective assistance of counsel. Two points are clear in Bradshaw . One, the court expressed concern over the continuing burden on young attorneys to shoulder the increasing financial burden of representing indigent criminal defendants. And two, the court questioned whether the existing system provided the constitutionally mandated right to counsel for an accused. Both rights are mentioned throughout the opinion.

At oral argument, the Unions sought to distinguish Janus by virtue of the Court's addressing the First Amendment right asserted by a public employee. While we acknowledge that difference, we note the Illinois Public Labor Relations Act's legal requirements for public unions share many features of the NLRA. See 5 Ill. Comp. Stat. Ann. 315/6 (West 2016) (requiring vote in a bargaining union for union representation; exclusive representation of all employees by the union; exclusive union negotiation with the employer on matters relating to "pay, wages, hours and other conditions of employment," including policy matters; union duty to represent the interests of all employees).

Recent examples of union organizing efforts in right-to-work states have occurred in South Carolina and Tennessee. See Doug Cameron, Boeing May Face Union Vote at 787 Plant , Wall St. J. (Jan. 20, 2017), https://www.wsj.com/articles/boeing-may-face-union-vote-at-787-plant-148492373l?mod=searchresults& page=1& pos=4 (visited Aug. 29, 2018) (article noting "long-running efforts to organize" by International Association of Machinists and Aerospace Workers); Christina Rogers, UAW Plans Another Push at Volkswagen , Wall St. J. (Sept. 17, 2014), https://www.wsj.com/articles/uaw-sets-up-local-at-volkswagen-in-tennessee-1410975613?mod=searchresults& page=1& pos=2 (visited Aug. 29, 2018) (article noting "[a] foothold in Tennessee would represent a major advance after a long series of failed attempts to organize Southern factories operated by foreign auto makers[ ]").

Even if we were to agree with the Unions, the Act would not be rendered void. First, we note that the Act has a severability clause, such that the invalidity of any section does not affect the other provisions. 2017 Ky. Acts ch. 1, § 13. Second, even absent a severability clause and an invalid emergency provision, the Act became effective ninety days following the adjournment of the legislature. Ky. Const. § 55 ; see McIntyre v. Commonwealth , 221 Ky. 16, 20, 297 S.W. 931, 933 (1927) (holding that when emergency clause in bill was ineffective, "the bill took effect 90 days after the adjournment of the [l]egislature[ ]").

Justice Felix Frankfurter, concurring in Railway Employes' , concluded his opinion with the following quotation:
"Where there is, or generally is believed to be, an important ground of public policy for restraint, the Constitution does not forbid it, whether this court agrees or disagrees with the policy pursued. It cannot be doubted that to prevent strikes, and, so far as possible, to foster its scheme of arbitration, might be deemed by Congress an important point of policy, and I think it impossible to say that Congress might not reasonably think that the provision in question would help a great deal to carry its policy along. But suppose the only effect really were to tend to bring about the complete unionizing of such railroad laborers as Congress can deal with, I think that object alone would justify the act. I quite agree that the question what and how much good labor unions do, is one on which intelligent people may differ; I think that laboring men sometimes attribute to them advantages, as many attribute to combinations of capital disadvantages, that really are due to economic conditions of a far wider and deeper kind; but I could not pronounce it unwarranted if Congress should decide that to foster a strong union was for the best interest, not only of the men, but of the railroads and the country at large."
Ry. Emps. , 351 U.S. at 241-42, 76 S.Ct. at 723 (Frankfurter, J., concurring) (quoting Adair v. United States , 208 U.S. 161, 191-92, 28 S.Ct. 277, 287, 52 L.Ed. 436 (1908) (Holmes, J., dissenting) ).
These quotations apply equally to both the Kentucky legislature and the United States Congress. In 2018, several members of the Kentucky House minority party filed a bill to reverse the Act. 2018 HB 237. Granted, this bill did not receive a hearing, but that fate was similar to that of any number of minority party bills seeking passage of right-to-work legislation prior to 2017. On the federal level, since § 14(b) of the Taft-Hartley Act represents an exception to federal preemption in labor-management relations, Congress can change that as well.