RENDERED: FEBRUARY 27, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-1150-MR

KENTUCKY DOWNS, LLC AND ECL
CORBIN, LLC                                                    APPELLANTS


                    APPEAL FROM FRANKLIN CIRCUIT COURT
v.                  HONORABLE PHILLIP J. SHEPHERD, JUDGE
                    ACTION NO. 23-CI-00282


ARKK PROPERTIES, LLC; B.J.
NOVELTY, INC.; THE CUE CLUB,
LLC; HOME RUN, LLC;
MFPALMINVESTMENTS, LLC;
VINCENT MILANO; TANYA
MILANO; POM OF KENTUCKY,
LLC; ATTORNEY GENERAL
RUSSELL COLEMAN; AND
CHURCHILL DOWNS, INC.                                          APPELLEES

AND

NO. 2024-CA-0875-MR

ARKK PROPERTIES, LLC; B.J.
NOVELTY, INC.; THE CUE CLUB,
LLC; HOME RUN, LLC;
MFPALMINVESTMENTS, LLC;
VINCENT MILANO; TANYA
MILANO; AND POM OF
KENTUCKY, LLC                                                  APPELLANTS

v.          HONORABLE PHILLIP J. SHEPHERD, JUDGE
ACTION NO. 23-CI-00282


RUSSELL COLEMAN, IN HIS
OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE
COMMONWEALTH OF KENTUCKY;
KELLY STEPHENS, IN HER
OFFICIAL CAPACITY AS CLERK OF
THE SUPREME COURT; AND
KATHRYN MARSHALL, IN HER
OFFICIAL CAPACITY AS FRANKLIN
CIRCUIT COURT CLERK                                    APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  THOMPSON, CHIEF JUDGE; EASTON AND ECKERLE, JUDGES.

THOMPSON,  CHIEF JUDGE:  These two appeals arise from a challenge to the

constitutionality of House Bill (H.B.) 594, 2023 Ky. Acts, Ch. 4, which amended

the definitions of "gambling" and "gambling device" in Kentucky Revised Statutes

(KRS) 528.010 to make skill-based amusement games illegal in Kentucky.  The

first appeal is from an interlocutory appeal denying a motion to intervene, and the

second appeal is from the summary judgment declaring the amendments in H.B.

594 to be constitutional. Having considered the record, the parties' respective arguments in their excellent briefs, the *amicus curiae* brief, and the applicable case law, we affirm.

The underlying matter began on March 23, 2023, with the filing of a complaint[1] and petition for declaration of rights and for injunctive relief in the Franklin Circuit Court against the Attorney General of Kentucky in his official capacity.[2] Plaintiffs ARKK Properties, LLC; B.J. Novelty, Inc.; The Cue Club, LLC; Home Run, LLC; MFPalmInvestments, LLC;[3] Vincent Milano; Tanya Milano; and POM of Kentucky, LLC (collectively, ARKK)[4] operate or play (Vincent and Tanya Milano) electronic skill-based games and devices in the Commonwealth of Kentucky.[5] These games, also referred to as "gray games" or "gray machines," are found in convenience stores, restaurants, and truck stops that

---

[1] ARKK filed an amended complaint on April 10, 2023, as detailed in footnote 7.

[2] At the time the complaint was filed, Daniel Cameron was the Attorney General. The Attorney General is now Russell Coleman.

[3] This party's name is spelled incorrectly in both notices of appeal. The correct spelling is MFPalmInvestments, LLC.

[4] Federal Post No. 313, The American Legion, Department of Kentucky, Inc., was also named as a plaintiff in the original complaint. It moved to be voluntarily dismissed, which was granted in July 2023.

[5] POM is a Wyoming limited liability company authorized to do business in Kentucky. It is the developer, manufacturer, owner, distributor, operator, and possessor of electronic skill-based gaming devices within Kentucky that have or will be banned and made illegal by the amendments in H.B. 594, including the Burning Barrel game.

retain the generated revenue, and were made illegal in the version of KRS 528.010 amended by H.B. 594.

In H.B. 594, the Legislature expanded the definitions of "gambling" and "gambling device" in KRS 528.010(7) to make skill-based games illegal:

(a) "Gambling device" means:

1. Any so-called slot machine or any other machine or mechanical device which when operated may deliver, as a result of the application of any element of chance, any money or property, or by the operation of which a person may become entitled to receive, as the result of the application of any element of chance, any money or property;

2. Any mechanical or electronic device permanently located in a business establishment, including a private club, that is offered or made available to a person to play or participate in a simulated gambling program in return for direct or indirect consideration, including but not limited to consideration paid for Internet access or computer time, or a sweepstakes entry, which when operated may deliver as a result of the application of any element of chance, regardless of whether the result is also partially or predominantly based on skill, any money or property, or by the operation of which a person may become entitled to receive, as the result of the application of any element of chance, regardless of whether the result is also partially or predominantly based on skill, any money or property; or

3. Any other machine or any mechanical, electronic, or other device, including but not limited to roulette wheels, gambling tables and similar devices, designed and manufactured primarily for use in connection with gambling and which when operated may deliver, as the result of the application of any element of chance, any money or property, or by the operation of which a person may become entitled to receive, as the result of the application of any element of chance, any money or property; or

4. Any electronic, computerized, or mechanical contrivance, terminal, machine, or other device that:

> a. Requires the direct or indirect payment of consideration which may include and shall not be limited to the insertion of a coin, currency, ticket, token, or similar object, or by depositing funds with the operator or owner of the device, to operate, play, or activate a game; and

> b. Offers games the outcomes of which are determined by any element of skill of the player and may deliver or entitle the person playing or operating the device to receive cash, cash equivalents, or gift cards or vouchers, billets, tickets, tokens, or electronic credits to be exchanged for cash or to receive merchandise or

something of value, whether
the payoff is made
automatically from the device
or manually.

The Legislature then carved out in subsection (b) several categories of game

devices that met the definition in subsection (a) but were excluded from the

definition of an illegal gambling device:

(b) The following shall not be considered gambling
devices within this definition:

1. Devices dispensing or selling combination
or French pools on licensed, regular
racetracks during races on said tracks;

2. Devices dispensing or selling combination
or French pools on historical races at
licensed, regular racetracks as lawfully
authorized by the Kentucky Horse Racing
Commission [now "Kentucky Horse Racing
and Gaming Corporation"];

3. Electro-mechanical pinball machines
specially designed, constructed, set up, and
kept to be played for amusement only. Any
pinball machine shall be made to receive
and react only to the deposit of coins during
the course of a game. The ultimate and only
award given directly or indirectly to any
player for the attainment of a winning score
or combination on any pinball machine shall
be the right to play one (1) or more
additional games immediately on the same
device at no further cost. The maximum
number of free games that can be won,
registered, or accumulated at one (1) time in
operation of any pinball machine shall not

exceed thirty (30) free games. Any pinball machine shall be made to discharge accumulated free games only by reactivating the playing mechanism once for each game released. Any pinball machine shall be made and kept with no meter or system to preserve a record of free games played, awarded, or discharged. Nonetheless, a pinball machine shall be a gambling device if a person gives or promises to give money, tokens, merchandise, premiums, or property of any kind for scores, combinations, or free games obtained in playing the pinball machine in which the person has an interest as owner, operator, keeper, or otherwise; or

4. Devices used in the conduct of charitable gaming;

5. Coin-operated amusement machines;

6. Devices used for wagering exempted from the application of this chapter pursuant to KRS 436.480;

7. Devices used in e-sports competitions; or

8. Devices used in skill-based contests, provided such devices do not meet the definition of gambling devices in paragraph (a) of this subsection[.]

KRS 528.010(7)(b).

At issue in the suit is a game with a trade name of Burning Barrel (the Game), which is an electronic, video-style, skill-based game where the result and

outcome, ARKK alleged, are based entirely and exclusively on the skill of the player rather than upon chance.[6]

In the complaint, ARKK sought a declaration of rights that the amendment in H.B. 594 was unconstitutional as it violated its rights of freedom of speech, due process, and equal protection; its rights against special legislation, the impairment of contracts, and the taking of property without just compensation; and separation of powers. ARKK also sought a temporary and permanent injunction against the Attorney General, law enforcement, prosecutors, government officers, and administrative agencies authorized to enforce Kentucky's laws, to enjoin them

---

[6] In a motion filed in the underlying action, ARKK further described the Game as follows:

> The Game is a currency or token-operated skill-based video game that offers three levels of play: a preview screen, a tic-tac-toe-style 3x3 grid puzzle with various audio-visual themes ("Wild Card"), and a colorful ["Simon"] style memory game ("Follow Me"). The player purchases credits to play the Game and sees a preview screen of a particular Wild Card game from which the player decides whether to commit credits to play. The player may preview dozens of puzzles and use skill to decide which puzzle is winnable, selecting the puzzle that the player wants to play. On every play, either the skillful player will solve the puzzle and win a prize of more than the funds committed to play, or the Game will direct the player to the "Follow Me" level. "Follow Me" is a memory game that requires the player to repeat one particular 20-part sequence of multi-colored dots, beginning with only the first dot in the sequence, then the first and second dot, and so on until all twenty dots in the sequence have been repeated. The skilled player who correctly repeats the sequence wins more than one hundred percent of the funds committed to play the Game. The combination of the preview phase, Wild Card, and Follow Me gives the skilled player the opportunity to win a prize of *over* one hundred percent of the funds committed with every play.

from enforcing the amendment against it and other similarly-situated persons or entities.[7]

Churchill Downs, Inc. (CDI) filed a motion in May 2023 seeking to intervene as a defendant in the action either as a matter of right or permissively pursuant to Kentucky Rules of Civil Procedure (CR) 24.01 and 24.02, respectively, stating that it had a substantial stake in the dispute because it offered lawful gaming options to Kentucky residents, including physical gaming machines, in-person wagering, and an online wagering platform. Gray machines, if allowed to continue without regulatory oversight or taxation, it argued, would "pose a direct and unfair threat to CDI's lawful gaming businesses, which are closely regulated and subject to governmental oversight and taxation." ARKK objected to the

---

[7] The Attorney General filed a notice to transfer the action to a different circuit court through random selection pursuant to KRS 452.005, specifically the newly enacted amendment in Senate Bill (S.B.) 126, Act of Mar. 29, 2023, ch. 131, 2023 Ky. Acts 774 (the venue transfer amendment). ARKK filed a motion to decline transfer as well as an amended complaint naming Kelly Stephens, in her official capacity as Clerk of the Supreme Court of Kentucky, and Kathryn Marshall, in her official capacity as Franklin Circuit Court Clerk, as defendants. In the amended complaint, ARKK added claims seeking a declaration that the venue transfer amendment was unconstitutional and injunctive relief to prevent any action taken under this amendment. The circuit court stayed ruling on ARKK's motion pending further direction from the Supreme Court of Kentucky and directed the parties to file the necessary pleadings with the Supreme Court to seek a determination by that Court on the issue. In an opinion rendered October 26, 2023, the Supreme Court ultimately concluded that the venue transfer amendment in "S.B. 126 is an unconstitutional encroachment by the legislative branch of government on the constitutionally conferred judicial powers of this Court and is not to be extended comity" and remanded the matter to the circuit court for denial of the Attorney General's request to transfer pursuant to S.B. 126. *ARKK Properties, LLC v. Cameron*, 681 S.W.3d 133, 145 (Ky. 2023).

motion. The court heard arguments on May 24, 2023, after which it directed further action from the parties.

Kentucky Downs, LLC, and ECL Corbin, LLC, filed a separate motion to intervene as defendants pursuant to CR 24.01 and 24.02 in September 2023. Kentucky Downs and ECL Corbin are two of the nine racetracks licensed to offer pari-mutuel wagering in Kentucky. Kentucky Downs offers pari-mutuel wagering on live, simulcast, and historical horse racing (HHR), while ECL Corbin offers this wagering on live racing and HHR. We shall refer to these two parties, collectively, as "Kentucky Downs" for ease of understanding. As CDI argued in its motion, Kentucky Downs stated that it had an interest in ensuring that Kentucky's gambling laws were enforced and a right to protect its business interests from unfair or illegal competition. ARKK again objected to intervention.

In an order entered September 26, 2023, the circuit court denied the motions to intervene under both Rules. Under CR 24.01 (intervention by right), the movants failed to demonstrate that their interests were directly related to this action, as they were regulated providers of a different type of gambling, or that their interests were not adequately represented. Under CR 24.02 (permissive intervention), the movants had not identified a statute conferring a conditional right to intervene or asserted that they had an interest or claim in common with the litigants. The court specifically held that "[m]ere economic competition is

-10-

inadequate to provide standing." However, the circuit court reserved the right to revisit this issue if the Attorney General did not choose to appeal an unfavorable outcome, and the court permitted CDI and Kentucky Downs to file *amicus curiae* briefs. Kentucky Downs appealed this order (Appeal No. 2023-CA-1150-MR), while CDI did not choose to do so.[8]

Meanwhile, the underlying matter continued. Prior to the entry of the ruling on the intervention motions, ARKK moved the court for a temporary injunction, and the court scheduled a bench trial/hearing for October 16, 2023. The Attorney General moved the court to exclude Dr. Raymond Pastore (who would testify about e-sport video games) and Dr. Olaf Vancura (who would testify about the relative amount of chance and skill present in the Game) as expert witnesses pursuant to Kentucky Rules of Evidence (KRE) 702. He argued that their testimony was not relevant to the single issue before the court; *i.e.*, whether H.B. 594's amendment to KRS 528.010 was facially constitutional. In late September 2023, Kentucky Downs filed a motion to stay the litigation until its appeal from the denial of the motion to intervene was decided. ARKK objected. The Attorney General filed a cross-motion for continuance, noting discovery issues, the appeal of the intervention ruling, and the unresolved venue issue.

---

[8] During the pendency of this appeal, the circuit court issued its final judgment on the merits of the underlying action, which was also appealed. This Court opted to delay its consideration of the earlier appeal and consider both appeals at the same time.

The court scheduled a pretrial conference for October 9, 2023, where the parties could discuss the pending motions. It entered an amended scheduling order the following day. The court scheduled ARKK's motion for a temporary injunction to be heard on October 16th; ordered the Attorney General to file a response to the motion for injunctive relief, "which the parties have agreed to also treat as a summary judgment motion under CR 56," along with any cross-motion for summary judgment; denied Kentucky Downs' motion to stay; addressed briefing issues; and reserved ruling on the motion to exclude expert witness testimony pending its ruling on the summary judgment motions. The Attorney General filed a combined response to ARKK's motion for a temporary injunction/motion for partial summary judgment and a cross-motion for partial summary judgment, arguing that ARKK could not overcome the presumption of H.B. 594's constitutionality. KRM Wagering, LLC (KRM),[9] moved for leave to file an *amicus curiae* brief, and CDI later filed an *amicus curiae* brief.

The court held the hearing as scheduled on October 16, 2023, where ARKK introduced testimony from Dr. Vancura (who was asked to review the Game and determine, in his opinion, whether it was predominately skill or chance-based; he determined it was predominately skill-based) and Rick Goodling (who is the National Director of Compliance for Pace-O-Matic and provided the

---

[9] KRM offers pari-mutuel wagering on HHR, like CDI, Kentucky Downs, and ECL Corbin.

foundation for the introduction of a video depicting the Game). ARKK also introduced the affidavit of Dr. Pastore, which included his report on e-sports.

On November 13, 2023, the circuit court denied ARKK's motion for temporary injunction pursuant to CR 65.04. It concluded that while ARKK had presented a substantial question on the merits, it had not established that public interest and a balance of the equities supported relief. The court also found that ARKK had shown the existence of "a serious question warranting trial on the merits" as to whether the Game qualified as protected speech and whether it was "gambling." Thereafter, ARKK moved the court to vacate the previously ordered briefing schedule and assign the matter for a trial on the merits. The Attorney General and Kentucky Downs disagreed in their respective responses. In an order entered November 29, 2023, the circuit court extended the briefing deadlines by 30 days and reserved its ruling on the motion to hold the pending motion for summary judgment in abeyance during discovery. By order entered December 19, 2023, the circuit court kept the current scheduling order deadlines in place.

In its response to the Attorney General's cross-motion for summary judgment (and in support of its own motion), ARKK argued that the Attorney General's motion was improper due to the existence of material issues of the disputed facts. It argued that the resolution of H.B. 594's ban on skill-based games furthers a legitimate governmental interest, which stated "whether the ban is within

-13-

the constitutional limits of the police power as being substantially related to the health, safety, morals, or general welfare of the public." To answer this question, the court would need to determine whether the Game was a game of skill; whether H.B. 594's ban on skill games is substantially related to the health, safety, morals, or general welfare of the public, in light of Kentucky's current gaming environment; and whether the Legislature's motivation for the amendment was economic protectionism. It went on to discuss the various legal arguments.

On June 28, 2024, the circuit court entered an order granting summary judgment to the Attorney General on ARKK's claims of free speech, arbitrariness, equal protection, special legislation, impairment of contracts, takings, and separation of powers. ARKK appealed from the final summary judgment (Appeal No. 2024-CA-0875-MR).

## APPEAL NO. 2024-CA-0875-MR

We shall first address ARKK's appeal from the summary judgment as our holding in that appeal will necessarily affect our review of Kentucky Downs' interlocutory appeal. And as the Attorney General noted in its brief, ARKK has narrowed the issues on appeal to its due process, equal protection, and free speech claims. It did not choose to seek review of the circuit court's ruling related to its special legislation, contracts, takings, or separation of powers claims, which are therefore waived.

-14-

Our review of an order granting summary judgment is as follows:

> Summary judgment is to be cautiously applied and should not be used as a substitute for trial. Granting a motion for summary judgment is an extraordinary remedy and should only be used to terminate litigation when, as a matter of law, it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor and against the movant. The trial court must review the evidence, not to resolve any issue of fact, but to discover whether a real fact issue exists. This review requires the facts be viewed in the light most favorable to the party opposing summary judgment. . . . Appellate review of a summary judgment involves only legal questions and a determination of whether a disputed material issue of fact exists. So we operate under a de novo standard of review with no need to defer to the trial court's decision.

*Shelton v. Kentucky Easter Seals Soc., Inc.*, 413 S.W.3d 901, 905 (Ky. 2013)

(internal quotation marks and footnotes omitted).

As we conduct our review, we shall keep in mind the high burden

ARKK must meet to establish its claim that H.B. 594 is unconstitutional:

> As a general principle of jurisprudence, it is well established that duly adopted legislation is entitled to a presumption of validity. All statutes shall be liberally construed with a view to promote their objects and carry out the intent of the legislature. KRS 446.080. Our constitution is a limitation on the broad exercise of power rather than a grant of specific power to the legislature. The General Assembly may enact laws which are not expressly or impliedly prohibited by the Constitution of Kentucky and the Constitution of the United States. . . . Our only function is in the interpretation of the acts of the other branches of government in the light of the

> Constitution, existing legal precedents and the legislation
> itself.

*Hayes v. State Property and Bldgs. Comm'n*, 731 S.W.2d 797, 799 (Ky. 1987).

I. DUE PROCESS CLAIM

ARKK asserts that the circuit court erred in granting summary judgment to the Attorney General and dismissing its Section 2 due process claim for two reasons. First, it argues that, in its analysis of the constitutional limits of police power, the circuit court failed to consider whether the ban on certain skill-based games has a real and substantial relationship to the health, safety, morals, or general welfare of the public under the current conditions and demands of society. Second, it argues that genuine issues of material fact remain to be decided by a fact-finder. The Attorney General contends that there are no fact issues that would preclude summary judgment and that H.B. 594 survives rational basis review.

"Section 2 of the Kentucky Constitution prohibits the arbitrary exercise of power by state government. In order to pass constitutional muster, a statute must be rationally related to a legitimate state objective." *Pigeons' Roost, Inc. v. Commonwealth*, 10 S.W.3d 133, 135 (Ky. App. 1999) (citing *Lost Mountain Mining v. Fields*, 918 S.W.2d 232 (Ky. App. 1996)). The Supreme Court of Kentucky described the rational-basis analysis, albeit in an equal protection context, in *Steven Lee Enterprises v. Varney*, 36 S.W.3d 391, 395 (Ky. 2000), relying upon the United States Supreme Court's decision in *Heller v. Doe by Doe*,

509 U.S. 312, 319-21, 113 S. Ct. 2637, 2642-43, 125 L. Ed. 2d 257 (1993), quoted

below:

> We many times have said, and but weeks ago repeated,
> that rational-basis review in equal protection analysis "is
> not a license for courts to judge the wisdom, fairness, or
> logic of legislative choices." . . . Nor does it authorize
> "the judiciary [to] sit as a superlegislature to judge the
> wisdom or desirability of legislative policy
> determinations made in areas that neither affect
> fundamental rights nor proceed along suspect lines." . . .
> For these reasons, a classification neither involving
> fundamental rights nor proceeding along suspect lines is
> accorded a strong presumption of validity. . . . Such a
> classification cannot run afoul of the Equal Protection
> Clause if there is a rational relationship between the
> disparity of treatment and some legitimate governmental
> purpose. . . . Further, a legislature that creates these
> categories need not "actually articulate at any time the
> purpose or rationale supporting its classification." . . .
> Instead, a classification "must be upheld against equal
> protection challenge *if there is any reasonably
> conceivable state of facts* that could provide a rational
> basis for the classification." . . .
>
> . . . . Finally, courts are compelled under rational-basis
> review to accept a legislature's generalizations even
> when there is an imperfect fit between means and ends.
> A classification does not fail rational-basis review
> because it "'is not made with mathematical nicety or
> because in practice it results in some inequality.'" . . .
> "The problems of government are practical ones and may
> justify, if they do not require, rough accommodations—
> illogical, it may be, and unscientific."

We agree with the Attorney General that the rational basis analysis is

the proper review to use here and that a heightened standard is not required. *See*

*Zuckerman v. Bevin*, 565 S.W.3d 580, 595 (Ky. 2018) ("[A] statute that merely affects social or economic policy . . . is subject to a less searching form of judicial scrutiny, *i.e.* the rational basis test." (internal quotation marks omitted).)

First, ARKK contends that there are two factual issues to be decided: 1) whether the current conditions and demands of society make the Legislature's decision to ban select skill games by labeling them as gambling is beyond police power; and 2) whether the Legislature's decision to ban skill-based games like the Game was motivated by economic protectionism (here, a desire to protect the horse racing industry's HHR games rather than a desire to protect the public's general welfare). We agree with the Attorney General that there are no genuine issues of material fact to be decided that would preclude a rational basis review.

In *Bloyer v. Commonwealth*, 647 S.W.3d 219, 226 (Ky. 2022), the Supreme Court of Kentucky described the burden a plaintiff has, also in the context of equal protection claims:

> We utilize the rational basis test to decide equal protection claims which do not involve a suspect class or interfere with fundamental rights. *Mobley v. Armstrong*, 978 S.W.2d 307, 309 (Ky. 1998). "[T]he burden is on the party claiming a violation of equal protection to establish that the statutory distinction is without a rational basis." *Id*. Bloyer mischaracterizes and misconstrues the rational basis test by attempting to shift the burden to the Commonwealth "to prove that it was rational to treat children that have the same characteristics as [Bloyer] the same way as an adult offender." Statutes are presumed to be constitutional and

-18-

the Commonwealth has no burden to produce evidence supporting the rationality of any statutory classifications. *Commonwealth v. Howard*, 969 S.W.2d 700, 703 (Ky. 1998).

In *Zuckerman*, 565 S.W.3d at 596, the Supreme Court of Kentucky emphasized that:

A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification. A legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data. A statute is presumed constitutional, and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record.

(Quoting *Heller v. Doe by Doe*, *supra.*) Based on these holdings, we must reject ARKK's argument that any genuine issues of material fact are left to be decided.

Turning to the merits of this argument, we must first recognize the long-standing statement of the law in *Commonwealth v. Kentucky Jockey Club*, 238 Ky. 739, 38 S.W.2d 987, 993-94 (1931):

For nearly half a century the General Assembly and the Court of Appeals have proceeded upon the general understanding that the whole subject of betting and gaming was within the power of the Legislature to prohibit, regulate, or classify, prohibiting in part and permitting in part, according to its view of the public policy to be enforced.

Having considered the parties' excellent arguments and the circuit court's order on this issue, we shall adopt the reasoning of the circuit court:[10]

> ARKK asserts HB 594 arbitrarily exceeds the scope of the legislature's police powers authority because it engages in economic protectionism rather than being rationally related to any substantial public purpose. Relying on the reasoning from [*Bruner v. City of Danville*, 394 S.W.2d 939 (Ky. 1965),] and [*Jasper v. Commonwealth*, 375 S.W.2d 709 (Ky. 1964)], ARKK asserts that no substantial public purpose was served by the banning of its games when the legislature simultaneously authorized mobile sports betting. Further, ARKK asserts that the police power can never be used to ban any game of skill, since gambling can only occur in games of chance.

> However, the Court is reluctant to endorse the reasoning that the police powers can never extend to games of skill. The term 'game of skill' is a term of art specifically defined by the legislature. The legislature certainly had the authority to previously enact the 'dominant factor' test that classified games of skill and chance based on which element predominantly determined the game's outcome. It stands to reason that if the legislature had the authority to enact the previous dominant factor test, it also has the authority to amend or clarify its definition of a game of skill. The Court rejects the idea that the plenary police powers of the legislature to define and regulate games of skill have been abrogated simply because it previously enacted a different definition.

> This Court is further persuaded by the arguments of the Attorney General that HB 594 was not an arbitrary exercise of the police powers simply because the

---

[10] We have substituted "ARKK" for "Plaintiff" and made corresponding alterations for subject/verb agreement for ease of understanding, as well as minor edits for consistency.

definition of a game of skill was amended in the same session the General Assembly passed mobile sports betting. The Attorney General correctly highlights that the Court's police powers analysis for arbitrariness will turn on whether there is a rational relation between HB 594's exercise of the police power and some legitimate governmental interest. Here, the Attorney General clearly argues the legislature exercised its police powers to amend the definition of a gambling device for the legitimate purpose of preventing the harmful effects to society that result from unregulated gambling devices.

Specifically, the Attorney General highlighted how Burning Barrel and other unregulated gambling devices are harmful as a matter of law (*see Commonwealth v. Stars Interactive Holdings (IOM) Ltd*., 617 S.W.3d 792, 804 (Ky. 2020)) and fact. It further explained how gray machine games like Burning Barrel operate untaxed and unregulated, and further fail to provide mandatory precautions to prevent underage gambling or problem gambling. This stands in stark contrast to legal gambling operators who are obliged to abide by the strict precautions related to underage and problem gambling.

Most importantly, however, the Attorney General persuasively cited to the *Jockey Club* case that held the legislature has the power to prohibit, regulate, and classify all forms of gambling. The Attorney General persuasively explained that the Legislature has a long history of regulating pinball games under state gambling laws, even though there were plenty of arguments to be made that pinball was predominantly based on skill rather than chance.

It is of no consequence to the Court's analysis that the legislature decided to enact mobile sports betting in the same legislative session it enacted HB 594. *Jockey Club* reaffirms the authority of the legislature to prohibit, regulate, and classify all forms of gambling, and the legislature was not acting arbitrarily in exercising its

long-standing authority to regulate gambling when it enacted HB 594. Because the public welfare at the time of this action is served by HB 594's clarification of the definition of a gambling device, the legislature properly exercised its police powers to amend the gambling device definition, and the clarification of the definition was rationally related to the legitimate interest in preventing the harms of unregulated gambling.

The Court is persuaded by *Jockey Club*, and the long history of regulating pinball machines, that HB 594 is not an arbitrary exercise of the police power.

Accordingly, we hold that the circuit court did not commit any error in granting summary judgment to the Attorney General on ARKK's due process claim.

## II. EQUAL PROTECTION CLAIM

ARKK contends with this argument that HB 594's ban on skill games violates equal protection because it arbitrarily singles out such games for a ban while allowing other types of games to operate. The Supreme Court of Kentucky described such claims as follows:

The 14th Amendment to the United States Constitution requires persons who are similarly situated to be treated alike. . . . Statutes are presumed to be valid and those concerning social or economic matters generally comply with federal equal protection requirements if the classifications that they create are rationally related to a legitimate state interest. Sections 1, 2, and 3 of the Kentucky Constitution provide that the legislature does not have arbitrary power and shall treat all persons equally. A statute complies with Kentucky equal protection requirements if a "reasonable basis" or

-22-

> "substantial and justifiable reason" supports the classifications that it creates. Analysis begins with the presumption that legislative acts are constitutional.

*Durham v. Peabody Coal Co.*, 272 S.W.3d 192, 195 (Ky. 2008) (citations in footnotes omitted). And as with the previous analysis, a rational basis review applies here. *See Bloyer*, 647 S.W.3d at 226 ("We utilize the rational basis test to decide equal protection claims which do not involve a suspect class or interfere with fundamental rights.").

We agree with the circuit court and the Attorney General that ARKK failed to establish the threshold requirement that gray machines, like the Game, are similarly-situated to lawful devices or activities, including video games for entertainment, e-sports devices, and mobile sports betting devices. The Attorney General correctly asserts that the lawful devices and activities are "subject to meaningful limits[,]" unlike the Game at issue here. Such limits include finding coin-operated amusement machines in children's establishments and limiting the value of the prizes offered, the competition against other players component of an e-sport competition, and the licensing requirements in digital sports wagering.

Accordingly, the circuit court did not err in granting summary judgment on ARKK's equal protection claim.

III.  FREE SPEECH CLAIM

For its third argument, ARKK asserts that the circuit court erred in determining that there were no disputed facts as to whether the Game was a video game and by concluding that a rational basis review applied, rather than strict scrutiny.  Again, we agree with the Attorney General that summary judgment was proper.

In *McDonald v. Ethics Committee of the Kentucky Judiciary*, 3 S.W.3d 740, 743 (Ky. 1999), the Supreme Court of Kentucky addressed free speech rights and confirmed that both state and federal precedent may be considered, explaining:

> [T]he Kentucky Constitution provides protection no greater than but co-extensive with the First Amendment to the United States Constitution[.]  [We therefore] consider both state and federal precedent in our analysis of movants' claim[.]
>
> The right to free speech is not absolute and states are permitted to regulate it within certain limitations if the regulation is within the public interest.  Necessarily, examination of a free speech claim requires a determination of the level of scrutiny proper for a particular restriction.

(Citations omitted.)

"Ratified in 1791, the First Amendment provides that Congress shall make no law abridging the freedom of speech.  Above all else, the First Amendment means that government generally has no power to restrict expression

-24-

because of its message, its ideas, its subject matter, or its content." *Barr v. Am.*

*Ass'n of Political Consultants, Inc.*, 591 U.S. 610, 618, 140 S. Ct. 2335, 2346, 207

L. Ed. 2d 784 (2020) (internal quotation marks and citation omitted).  The *Barr*

Court then observed that the applicable precedents would allow

> the government to constitutionally impose reasonable
> time, place, and manner regulations on speech, but the
> precedents restrict the government from discriminating in
> the regulation of expression on the basis of the content of
> that expression.  Content-based laws are subject to strict
> scrutiny.  By contrast, content-neutral laws are subject to
> a lower level of scrutiny.

*Id*. (internal quotation marks and citations omitted).  We agree with the circuit

court and the Attorney General that HB 594 targets the conduct of gambling, and it

therefore represents a content-neutral law that would be subject to a lower level of

scrutiny.

ARKK contends that the Game constitutes a protected video game.

On the other hand, the Attorney General, while he does not dispute that some video

games are protected, asserts that is not the case here.  The United States Supreme

Court has addressed video games that would be protected:

> Like the protected books, plays, and movies that
> preceded them, video games communicate ideas—and
> even social messages—through many familiar literary
> devices (such as characters, dialogue, plot, and music)
> and through features distinctive to the medium (such as
> the player's interaction with the virtual world).  That
> suffices to confer First Amendment protection.  Under
> our Constitution, esthetic and moral judgments about art

-25-

and literature are for the individual to make, not for the
Government to decree, even with the mandate or
approval of a majority.

*Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 790, 131 S. Ct. 2729, 2733, 180 L.

Ed. 2d 708 (2011) (internal quotation marks, ellipses, and citation omitted).  In this

case, we agree with the Attorney General that the Game does not reach the level of

expressive activity that would entitle it to protection as free speech.  It is not

enough that "[p]layers receive entertainment and intellectual excitement from their

skillful play" and that it "contains audio-visual themes within each title" as ARKK

urges this Court to conclude.

Accordingly, the circuit court did not err in granting summary

judgment to the Attorney General on ARKK's free speech claim.

**APPEAL NO. 2023-CA-1150-MR**

We shall now consider Kentucky Downs' appeal from the order

denying the motions to intervene pursuant to CR 24.01 or CR 24.02.  In denying

these requests to intervene, the circuit court concluded that Kentucky Downs had

neither demonstrated that it had a direct, substantial interest in the litigation, nor

that the Attorney General would not adequately represent that interest.  In addition,

the circuit court stated that it reserved the right to revisit the ruling should the

Attorney General choose not to appeal an unfavorable ruling and permitted the

filing of *amicus curiae* briefs as well as access to discovery.  The circuit court

ultimately ruled in favor of the Attorney General on the merits, and we have affirmed that judgment. Accordingly, there is no need to address the merits of this interlocutory appeal, and we therefore affirm.

## CONCLUSION

For the foregoing reasons, the above-styled appeals are affirmed.

ALL CONCUR.

APPEAL NO. 2023-CA-1150-MR

BRIEFS FOR APPELLANTS
KENTUCKY DOWNS AND ECL
CORBIN:

Jay E. Ingle
Christopher F. Hoskins
Jennifer L. Horan
Lexington, Kentucky

BRIEF FOR APPELLEES ARKK
PROPERTIES, LLC; B.J. NOVELTY,
INC.; THE CUE CLUB, LLC; HOME
RUN, LLC;
MFPALMINVESTMENTS, LLC;
VINCENT MILANO; TANYA
MILANO; AND POM OF
KENTUCKY, LLC:

J. Guthrie True
Richard M. Guarnieri
Frankfort, Kentucky

R. Kenyon Meyer
Louisville, Kentucky

M. Evan Buckley
Lexington, Kentucky

APPEAL NO. 2024-CA-0875-MR

BRIEFS FOR APPELLANTS:

J. Guthrie True
Richard M. Guarnieri
Frankfort, Kentucky

R. Kenyon Meyer
Louisville, Kentucky

M. Evan Buckley
Lexington, Kentucky

BRIEF FOR APPELLEE
ATTORNEY GENERAL RUSSELL
COLEMAN:

Matthew F. Kuhn
Solicitor General

John H. Heyburn
Principal Deputy Solicitor General

Jacob M. Abrahamson
Assistant Solicitor General
Frankfort, Kentucky

*AMICUS CURIAE* BRIEF FOR
KENTUCKY DOWNS, LLC AND
ECL CORBIN, LLC:

Jay E. Ingle
Christopher F. Hoskins
Jennifer L. Horan
Lexington, Kentucky